Leonard M. Shulman, SB 126349
Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Dr., Suite 600
Irvine, CA 92618
Telephone: (949) 340-3400
Email LShulman@shulmanbastian.com
*Local Counsel*

MAX FOLKENFLIK
FOLKENFLIK & MCGERITY
1500 Broadway, Suite 810
New York, NY 10036
Telephone: (212)757-0400
Email mfolkenflik@fmlaw.net
*(applying for admission pro hac vice)*
*Attorneys for the Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARON AND ODELYA HOFFMAN; RGL MANAGEMENT LLC, A CALIFORNIA LIMITED LIABILITY COMPANY; RGL HOLDINGS LLC, A NEVADA LIMITED LIABILITY COMPANY; VITAMIN FRIENDS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY,<br><br>*Plaintiffs*,<br><br>vs.<br><br>GOLI NUTRITION, INC., (A CANADIAN CORPORATION); GOLI NUTRITION INC., (A DELAWARE CORPORATION); 12416913 CANADA INC.; DEEPAK AGARWAL; MICHAEL BITENSKY; VMG PARTNERS, LLC; VMG PARTNERS IV, LP; VMG PARTNERS MENTORS CIRCLE IV L.P.; MERICAL INC.; AND DLA PIPER LLP (US).<br><br>*Defendants*. | Case No.    2:23-cv-06597<br><br>**COMPLAINT FOR STATUTORY AND COMMON LAW TORTS, INCLUDING SECURITIES FRAUD AND COMMON LAW FRAUD, VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, AIDING AND ABETTING, AND, AS TO DLA PIPER LLP (US), LEGAL MALPRACTICE AND BREACH OF FIDUCIARY DUTY**<br><br>**PLAINTIFFS DEMAND A JURY TRIAL** |

Plaintiffs Sharon And Odelya Hoffman, (the "Hoffmans"), RGL Holdings LLC, and RGL Management LLC (collectively "RGL"), and Vitamin Friends LLC ("Vitamin Friends") bring this complaint against Defendants Goli Nutrition, Inc. (Canada), Goli Nutrition, Inc. (Delaware) (collectively "Goli"), 12416913 Canada Inc. ("6913") Deepak Agarwal ("Agarwal"), Michael Bitensky ("Bitensky") (Goli, Agarwal, Bitnsky and their affiliated entities are hereinafter collectively referred to as the "Goli Defendants"), VMG Partners, LLC, VMG Partners Mentors Circle IV L.P., VMG Partners IV, LP (hereinafter the "VMG Defendants"), Merical Inc. ("Merical"), and DLA Piper LLP (US) ("DLA Piper") allege as follows:

## INTRODUCTION

1.    This case is brought because of the greed, dishonesty, betrayal of trust and breach of contracts by the Goli Defendants, who with the knowing assistance and agreement of the other defendants, destroyed the business Sharon Hoffman owned, Better Nutritionals, as well as the business of Vitamin Friends and RGL, and destroyed the reputation of the Hoffmans causing severe direct injury to the Plaintiffs.

2.    The Hoffmans were manufacturers of gummy "dietary supplements" in a factory they built in Gardena, California. The manufacture of dietary supplements is highly regulated by both the Federal Food and Drug Administration ("FDA") and California law. Goli first approached Better Nutritionals in 2018 seeking the development of a formulation for apple cider vinegar gummies. The formulation created by Better Nutritionals was so successful that Goli represented to, and promised, Sharon Hoffman that Goli would buy all the Goli gummies that Better Nutritional could make and also represented and promised Sharon Hoffman that Better Nutritionals would be Goli's exclusive manufacturer. Both of those representations were knowingly false when made, and within three years those promises were suddenly and unlawfully breached.

3.    At first, however, things were going well. In the following years, both Goli's business and Better Nutritionals' business of manufacturing for Goli exploded.

In reliance on Goli's promises to Sharon Hoffman and in response to Goli's demand that Better Nutritionals increase its production capacity, Sharon Hoffman caused Better Nutritionals to expand its manufacturing business by opening a 420,000 square foot manufacturing facility in Norco California, that Better Nutritionals paid for, but (as a result of deception) Goli owned. Part of Goli's deceitful plan was to hold the lease and equipment at Norco in Goli's name, which Goli told Better Nutritionals was only for Goli to act as a placeholder, falsely promising to assign everything to Better Nutritionals on demand, a promise on which Goli reneged.  Once Better Nutritionals had paid the $3.0 million security deposit, paid for the equipment as well as the monthly rent for the facility lease, Goli refused Sharon Hoffman's demand  that the leasehold and title to the equipment be transferred to Better Nutritionals as promised.

4.    Goli represented 93% of Better Nutritionals' business in 2021and recognized the profit Better Nutritionals was realizing from its gummy business.  In that year, Better Nutritionals had revenues of $223,000,000.  Goli coveted the profits that Better Nutritionals was making.

5.    In 2020, Goli had hired an investment banker to explore the possibility of selling the Goli business.   On information and belief, Goli became aware of the added value that vertical integration could add to the Goli business if Goli ultimately sold an integrated enterprise which  included Better Nutritionals.  At that point, if not sooner, Goli developed a plan to force Better Nutritionals into selling its business at a severely discounted price to a buyer who would effectively integrate the Better Nutritionals manufacturing business into Goli, either through direct ownership or de facto control of the manufacturing and pricing of Better Nutritionals' production and supply.

6.    In furtherance of that plan, in the summer of 2021, Goli without any notice to Better Nutritionals, suddenly and unexpectedly reduced certain sales projections it had provided to Better Nutritionals, ultimately by 90%, and on which Better Nutritionals had relied, and then refused to pay for $180 million of products it had ordered from Better Nutritionals. Further, in violation of its commitment to Better

1   Nutritionals as its exclusive manufacturer, Goli diverted significant manufacturing
2   away from Better Nutritionals to Defendant Merical in the fall of 2022.

3       7.      Through these actions, and the others described below, Better
4   Nutritionals was unable to meet its recently increased financial obligations and was
5   ultimately forced into bankruptcy, first filing as a Chapter 11 reorganization and later
6   converted into a Chapter 7 liquidation. While Goli's wrongful, unlawful and tortious
7   acts caused damage to Better Nutritionals that can now be sought by the Chapter 7
8   Trustee (the "Trustee"), those same wrongful, unlawful and tortious acts also caused
9   all Plaintiffs substantial and direct financial loss, for which the Plaintiffs have a right
10  to seek the compensation being sought in this action. In addition, should the Trustee
11  recover sufficient funds to pay creditors and administrative expenses in full, Sharon
12  Hoffman's equity in Better Nutritionals may have significant value, although
13  undoubtedly less than it would have had but for Defendants' wrongful acts.

14      8.      Whether Sharon Hoffman is able to recover some value for his equity in
15  Better Nutritionals, as explained in more detail below, Defendants' wrongful, unlawful
16  and tortious acts caused the Plaintiffs numerous lost business opportunities,
17  reputational injury, years of almost unimaginable personal anxiety, depression and
18  stress, in addition to direct financial loss.

19      9.      The Hoffmans are attempting to re-start their gummy manufacturing
20  business in Gardena. Now, however, although they were first movers in an industry
21  where there were few competitors, in the years since 2018 the number of gummy
22  manufacturers has increased dramatically. Customers of contract manufacturers tend
23  not to be willing to switch from one contract manufacturer to another contract
24  manufacturer. Customers lost as a result of Goli's fraud are also very difficult to re-
25  acquire. Particularly in light of the Hoffmans' reputational injury, the absence of
26  available funds and the financing needed to get their business rebuilt, the Hoffmans
27  and Vitamin Friends have experienced direct and substantial losses.

28

10.    Further, Sharon Hoffman has lost the value of his equity interest in Better Nutritionals and Vitamin Friends.  From the beginning of their entry into the dietary supplement business, the Hoffman's always contemplated a sale of their business as their exit strategy.  Prior to Goli's effectuating its plan to drive the Hoffman's into a forced sale, the Hoffman's received a number of offers from interested purchasers.  In the 2017 time period, similar contract manufacturers were selling their businesses at multiples up to 100 times gross revenues. Indeed, at that time Sharon received an offer to sell Better Nutritional for 100 times gross revenues of $300,000.  Because he projected substantial increases in revenue in the coming years, Sharon rejected that offer.  Better Nutritionals gross revenues increased rapidly after 2017.  In the fall of 2021, Better Nutritionals was valued at $1.3 billion dollars by a qualified industry analyst.    Sharon   Hoffman's   75%   ownership   interest   was   therefore   worth approximately $1 billion.

11.    With Better Nutritionals in a Chapter 7 proceeding, the value of Sharon Hoffman's equity interest is currently zero.  Although Sharon Hoffman is trying to re-start his business, there is no current substantial value to his contract manufacturing business for him to sell.

12.    The gummy contract manufacturing business was relatively small in 2018, and the Hoffman's had a "first mover" advantage, an advantage that was lost due to the tortious and otherwise wrongful conduct of the Defendants.

13.    In addition to the above direct injuries, Defendants' wrongful acts caused numerous direct injuries to the Hoffmans and to Vitamin Friends, including but not limited to, the following

    a. Based on fraudulent promises of exclusivity for Better Nutritionals, Goli insisted on having priority of production over all other customers, which compelled the Hoffman's to direct Better Nutritionals manufacturing capacity to Goli and away from those customers as well as from the Hoffman's wholly owned brand,

Vitamin Friends.  As a result, the wrongful conduct of Goli caused Better Nutritionals and Vitamin Friends direct injury in losses of sales, customers, and shelf space.

   b. Because of the Bankruptcy, the Hoffmans have been subjected to suits against them personally.  Those suits  also have resulted in the direct injury to the Hoffmans resulting from Defendants' wrongful acts.

   c. During the course of the Bankruptcy proceedings, Goli made defamatory and disparaging claims that the Bankruptcy had occurred because the Hoffmans had stolen money from Better Nutritionals. Those defamatory and disparaging statements caused reputational injury to the Hoffmans with suppliers with whom they had worked for many years and with whom they would hope to work in the future.

## THE PARTIES

14.     Plaintiffs Sharon and Odelya Hoffman are individuals who reside at 117 South Royal Ascot Drive, Las Vegas, Nevada 89144.

15.     Plaintiff Vitamin Friends LLC is a California Limited Liability Company with its principal place of business and headquarters at 17120 South Figueroa Street, Unit B, Gardena, CA 90248. The sole member of the Vitamin Friends LLC is Sharon Hoffman.

16.     Plaintiff RGL Holdings LLC is a Nevada  Limited Liability Company with its principal place of business is at  1930 Village Center Cir. STE 3-136, Las Vegas, NV 89134. The sole member of the RGL Holdings LLC is Sharon Hoffman. RGL Holdings holds Sharon Hoffman's 75% interest in Better Nutritionals.

17.     Plaintiff RGL Management LLC is a California Limited Liability Company with its principal place of business and headquarters at  17120 South Figueroa Street, Unit B, Gardena, CA 90248. The sole member of the RGL

Management LLC is Sharon Hoffman. RGL Holdings holds Sharon Hoffman's 100% interest in RGL Management.    RGL Management owns the lease on the Gardena facility as well as equipment at the Gardena facility and the Norco facility.

18.    Defendant Goli Nutrition, Inc. (Canada) is a corporation organized under the laws of Canada, with its principal place of business at 1 Westmount Square, Suite 1500, Westmount, H3Z2P9, Quebec, Canada.    Goli is a retail seller and marketer of specially manufactured nutritional supplements, including gummies. Starting in 2018, and until 2021, Better Nutritionals was the sole manufacturer of the gummy products sold by Goli.

19.    Defendant Goli Nutrition, Inc. (Delaware) is a corporation organized under the laws of the State of Delaware with its principal place of business at  8430 Santa Monica Blvd #204, West Hollywood, CA 90069.  On information and belief, Defendant Goli Nutrition, Inc. (Delaware) is the alter ego of Goli Nutrition, Inc. (Canada) and was formed solely for the purpose of entering into certain equipment purchases and real estate lease for Better Nutritionals' Norco facility.

20.    Defendant 12416913 Canada Inc. ("6913"), is a corporation organized under the laws of Canada, with its principal place of business at 1 Westmount Square, Suite 1500, Westmount, H3Z2P9, Quebec, Canada.

21.    Defendant Deepak Agarwal is a co-founder of Goli and served as its Co-Chief Executive Officer /Co- President at all times relevant to this complaint.  On information and belief, Agarwal resides at 3150 place de Ramezay, Unit 206-2, Montreal, H3Y 0A3 Canada.

22.    Defendant Michael Bitensky is a co-founder of Goli, and served as its Co-Chief Executive Officer /Co- President at all times relevant to this complaint.  On information and belief, Bitensky resides in Montreal, Québec, Canada.

23.    Defendant VMG Partners is a private equity investment firm that has its headquarters at 39 Mesa Street, Suite 310, San Francisco, CA 94129.  VMG operates through separate investment funds each of which has a specific pool of investment

capital and a specific portfolio of investments. VGM Partners' investment funds include Defendant VMG Partners IV L.P. ("VMG Partners IV") and VMG Partners Mentors Circle IV L.P., which are investors in Goli and have a right to receive profits from those investments.

24.    While VMG may portray itself when it convenient as a "passive investor," its own description of its involvement in the businesses in which it invest belies that claim.  On its website, VMG claims: "Our companies get access to the talent, strategies, and connections we believe are needed to navigate the path to success. Most importantly, entrepreneurs get support from an experienced team they can count on when it counts the most. We aim to be our entrepreneurs' first call when they have a breakthrough, and their first call when they have a breakdown. We give them hands-on support, the tough love we think they need to hear, and a team of people committed to their success."

25.    Two members of VMG Partners IV's management team , who are also partners in VMG Partners (Wayne Wu and Jonathan Marshal) sit on Goli's board of Directors. A third member of Goli's Board was appointed by VMG as an independent director, although that appointee's relationship with VMG establishing such "independence" is not currently known to Plaintiffs.  On information and belief discovery will show that the "independent" director votes with the two VMG directors and provides additional control by VMG over the a business decisions of Goli.

26.    Moreover, under the Goli Shareholders' Agreement, VMG has extraordinary and numerous "consent" rights with respect to  Goli's authority to take certain actions, including disclosure by Goli to VMG and attendant approval rights of Goli budgets and business conduct, litigation, and the ability to take action against Agrawal and Bitensky should they credibly be accused of fraud.  In addition, under Section 6.8 and the related sections of the Goli Shareholders' Agreement, VMG also has an "Initiation Right" and the right to form a "Special Sale Committee", which rights collectively accord VMG the power to force a sale of Goli and to approve or

disapprove the terms of any such sale. On information and belief, by March 2022, if not sooner, VMG was aware of the wrongful, unlawful, and tortious conduct of Goli and its principals (VMG partners Wu and Marshall had been informed by the Hoffmans of the Goli's wrongful conduct in March 2022)and agreed with Goli and its principals that such conduct should occur.

27.    Defendant Merical is a manufacturer of private label dietary supplements with its manufacturing facility at 233 East Bristol Lane, Orange, CA 92865.  Merical began producing Goli gummy products in October 2022.

28.    Defendant DLA Piper is the United States affiliate of an international law firm with its headquarters at 444 West Lake Street Suite 900 Chicago, IL 60606.  At all relevant times, DLA Piper served as counsel for **both** Plaintiff Better Nutritionals and Sharon Hoffman as well as for Defendants Goli, Agarwal and Bettinsky. Defendant DLA Piper ceased representing Sharon Hoffman and  Better Nutritionals in August 2021.

## JURISDICTION AND VENUE

29.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1338(a), and 28 U.S.C. § 1332, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as well as pendent jurisdiction over claims based on state law.

30.    Venue is proper in this District pursuant to 28 U.S.C. 1391(c) in that Defendants are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

**A. The Hoffman's Early Success in Selling Gummy Vitamins and Manufacturing Gummies for Other Wholesale and Retail Customers.**

31.    In 2012, the Hoffmans founded Vitamin Friends as a brand of gummy vitamins for children.  While gummy vitamins had been around for many years in the United States and most countries, gummy vitamins were formulated with gelatin. Gelatin is generally derived from boiling pig skins and tendons, and causes the gummies to stick to the user's teeth.  The Hoffmans' two year old son's pediatrician

COMPLAINT

1  had recommended that their son be given gummy vitamins. But because the gummy

2  vitamins stuck to their son's teeth, he developed serious dental problems.

3      32.    To cure that problem, Sharon Hoffman decided to manufacture his own

4  brand of vitamins for children, and Vitamin Friends was born.  Vitamin Friends

5  developed a formula using pectin derived from orange peels rather than gelatin derived

6  from animals. That innovation enabled Vitamin Friends to make gummy vitamins that

7  do not stick to the teeth.  In addition, Vitamin Friends' vitamins were both vegan and

8  kosher.  Vitamin Friends was the first to market  a pectin gummy product in the United

9  States.  Pectin based gummies also have the advantage of not being degraded by heat

10  and humidity, which allows them to be shipped during summer months which in turn

11  allows for broader distribution as the product makes it suitable for use in countries

12  with hotter climates. It also allowed for distribution during the summer months in the

13  United States.  Vitamin Friends was also the first child vitamin with Iron, as well as

14  other innovations.

15      33.    Although initially manufactured by a contract manufacturer in Israel, the

16  Hoffmans decided that they could improve quality control by developing their own

17  manufacturing facility in Gardena California. It was in their Gardena facility that

18  Sharon Hoffman through Vitamin Friends  developed Vitamin Friend's trade secret

19  manufacturing processes and formulations that subsequently Vitamin Friends

20  permitted  Better Nutritionals to use when it manufactured products for Vitamin

21  Friends.  The Gardena  factory was also the first in the United States to implement the

22  use of starchless gummies which was also an innovation in gummy manufacturing.

23  Starchless technology allowed the Gardena facility to run "clean" from production run

24  to production run with differing formulations, a process which was not possible with

25  starch-based gummies.

26      34.    The organization of, and equipment utilized on the production lines was

27  also innovative.  The Hoffmans were quickly recognized as the most reputable and

28  most innovative contract gummy manufacturers in the industry.  In 2016, Abbot Labs

said that they wanted to introduce a gummy line and the Hoffman's Gardena facility was the only facility to meet its standards. In addition to Abbot Labs, the Hoffman's were approached by national and international distributors including Nestle, Pfizer and Nature Made. They were also certified to manufacture CBD gummies, and were the number one manufacturer of those products, chosen to manufacture for Charlotte's Web, Martha Stewart's CBD gummy line, and others.

35. Market acceptance started slow, but once it took off, it grew rapidly. In 2017 they were selling $300,000 of gummies annually. By 2018, they were selling $4 million of gummies per year. By the next year it was $23 million. Most of their business was selling wholesale to retailers and they rapidly expanded their sales and shelf space in retail markets, including Whole Foods, Krogers and IHerb, among others. They also sold direct to consumers via Amazon.

36. Nutritional gummies are nutrient-enriched, chewable, dietary products similar to soft candy. Gummies are an increasingly popular alternative to traditional multi-vitamins and dietary supplements in pill form because they are easier to ingest and have appealing textures and flavors. As of 2020, nutritional gummies were a $16 billion industry expected to grow at a significant annual rate over the next decade owing to increasingly health-conscious consumers.

37. In 2015, the Hoffman's incorporated Better Nutritionals as the entity engaged in manufacturing for Vitamin Friends and to act as a contract manufacturer of nutritional gummy products for third parties. Better Nutritionals quickly made a name for itself by manufacturing innovative, high-quality products and by becoming one of the most-highly certified supplement manufacturers in the world. Within a few years, Better Nutritionals attracted a significant number of top-tier domestic and foreign clients, including Abbott Labs, Amway, Jarrow Formulas, Vita Yummy, Charlotte's Web, Pharmacare (Sambucol), Vesco Vitamins, and Premama Wellness.

38. Manufacturing nutritional gummy products is expensive, large-scale chemistry, requiring precise control over a complex and resource-intensive production

process.  At the front end of the manufacturing process, Better Nutritionals expended significant resources and capital to prepare for production, often before receiving full payment from its customers.  Thus, as is common in the industry and as its commercial partners know, Better Nutritionals is expected to rely and, in fact, did heavily rely on the accuracy — and truthfulness — of the purchase orders and sales forecasts it received from its clients.

39.    By late 2018, Better Nutritionals had around fifteen employees and could manufacture approximately 400,000 bottles of nutritional gummy products each month out of its small factory in Gardena, California, earning annual revenues of approximately $4,000,000 and annual profits of $1,000,000.

40.    In 2018, Agarwal gave Better Nutritionals an ACV (Apple Cider Vinegar) Gummy produced by another manufacturer and asked if Better Nutritionals could produce that product.  At that time, there was an active and growing market for ACV products in general, and gummies in particular, that Goli wanted to break into.

41.    Sharon Hoffman immediately recognized that the product had an unacceptably unpleasant smell and taste—the ACV gummies smelled and tasted like vinegar, not apple, a defect shared by the other ACV gummies then available.  Mr. Hoffman and the food chemists working under his guidance and supervision, set about to correct that defect and make their ACV gummies taste like apple, not vinegar.  And they did. Goli was so pleased with the formulation, that it promised, both on telephone calls with Sharon Hoffman, and confirmed in writing, that Better Nutritionals would be the exclusive manufacturer of Goli gummies, and further, that Goli would buy all of the gummies that Better Nutritionals could produce.  As a result, Sharon Hoffman caused Better Nutritionals to shift its focus to primarily producing gummies for Goli.

**B.    Goli Enlists Better Nutritionals as Its Sole Manufacturer.**

42.    Agarwal and Bitensky founded Goli in 2017 as a retail seller of specially manufactured nutritional supplements, including gummies. Goli secured substantial financial backing to market the world's first apple cider vinegar gummy ("ACV

1   Gummy"), which it linked to a range of health benefits, including digestion, weight
2   management, immunity, energy, and improved complexion.

3     43. In 2018, Sharon Hoffman's friend (and later a Better Nutritionals'
4   employee), Ariel Guizar, was contacted by Goli to see if he could find a reputable
5   Gummy manufacturer. Ariel recommend that Goli use the manufacturing services that
6   Better Nutritionals could offer. Goli then approached Sharon Hoffman and asked him
7   to develop a formulation for ACV Gummies.

8     44. As described above, following Sharon Hoffman's extremely successful
9   formulation of ACV gummies for Goli, in late 2018, Goli enlisted Better Nutritionals
10  to be its sole manufacturer for the ACV Gummy. Before starting production, Better
11  Nutritionals provided Goli with detailed per-unit production costs that included Better
12  Nutritionals' costs, such as ingredients and materials, and costs imposed by third
13  parties, such as packaging suppliers. Goli did not dispute these production costs.

14    45. The Parties agreed to payment terms in November of 2018. Goli agreed
15  to pay Better Nutritionals an agreed price per bottle (which included ingredients,
16  supplies, and manufacturing), to advance half of the total cost for each order at the
17  time of placing each order, and to pay the remaining amount due when Better
18  Nutritionals released finished and final batches of gummies from its facility for pickup
19  by Goli (batches that would vary in quantity depending on Better Nutritionals'
20  production capacity).

21    46. These payment terms required Better Nutritionals to incur the full
22  expense of manufacturing the gummies with only 50% of the total payment in its
23  coffers. Prompt pickup and payment is standard in the industry, both because the
24  products by government regulation have a limited shelf life, and because the payment
25  of the balance was crucial to Better Nutritionals' business. Thus, Goli's prompt pickup
26  and payment after product delivery was critical to Better Nutritionals.

27    47. With the payment terms in place, Goli placed its first purchase order for
28  100,000 bottles, with a second order (contingent on Goli's satisfaction with the first)

to follow for 300,000 bottles.  In fact, Goli was so pleased that it increased its second order from 300,000 bottles to 600,000 bottles, but negotiated a lower price-per-bottle. This lower price remained constant for years, despite rising supply chain costs and Goli's ever-increasing demand for more product.  Goli's third order, coming shortly after the first two, was for 1,000,000 bottles.  Better Nutritionals manufactured and Goli accepted and paid for each order pursuant to the terms of the Parties' agreement.

48.    Goli described Better Nutritionals' finished product as "simply amazing" and "absolutely perfect."  In May of 2019, Agarwal assured Better Nutritionals' co-founder and CEO, Sharon Hoffman, on a telephone call that Goli would buy every bottle of Goli gummies Better Nutritionals could produce and even boasted that Better Nutritionals could not produce bottles fast enough to meet Goli's needs.  Agarwal frequently repeated these statements to Hoffman on future telephone calls and over Telegram Messenger, emphatically imploring Hoffman to keep producing greater quantities as quickly as possible.

49.    Following Goli's promise to buy every bottle Better Nutritionals could produce, the Parties shifted to a demand-based ordering process typical in the manufacturing industry.  Goli would submit "sales forecasts" and "blanket purchase orders" at regular intervals (typically monthly) that it expected Better Nutritionals to immediately act upon by reserving production capacity, ordering ingredients, beginning production, and planning for future production.  In general, retail sellers like Goli use this process to minimize stocked inventory, which does not generate value, and avoid paying for warehouse space.

50.    This process was repeated over and over again by the Parties.  Better Nutritionals would receive a sales forecast and purchase order from Goli and immediately start production.  All the while, Goli communicated only one message: that it needed more and more product.  Better Nutritionals relied on Goli's promise and representation that it would pay for every bottle of gummies that Better Nutritionals could produce.  As it did so, Better Nutritionals continued to take on

greater upfront risk to manufacture a substantially higher volume of gummies at a rapidly increasing pace.

51.    Between 2018 and mid-2021, Goli submitted very large and constantly increasing purchase orders to Better Nutrionals, more than Better Nutritionals could fill using the Gardena facility alone.  Goli's forecasts were also provided by Goli to suppliers of raw materials to persuade them to extend credit to Better Nutritionals for the purchase of the materials Better Nutritionals needed to manufacture Goli products at the levels projected by Goli.

52.    The successful formulation Better Nutritionals developed was submitted to the United States Patent office in 2019 for a compositional patent.  DLA Partner, and Agarwal's close relative Ismael, was in charge of the patent application.  In consideration of Goli's  promise of "exclusivity" to Better Nutritionals, Sharon Hoffman agreed to have  Goli's principals and their wives or girlfriends being (falsely) named as inventors  on the patent application, and Sharon Hoffman agreed to have the patent assigned to Goli in exchange for Goli's commitment  to make Better Nutritionals its "exclusive" manufacturer.  But as set forth in more detail below, ultimately the commitment of "exclusivity" was dishonored, and other than empty promises by Goli, Goli failed to prosecute the patent application as promised.

53.    Because the Better Nutritionals formulation and processes (based on Vitamin Friends' IP) created a game changing product, Goli planned to aggressively market and sell the ACV gummies, emphasizing not only the claimed health benefits of ACV, but, most importantly, the fact that thanks to Better Nutritionals, Goli's ACV gummies tasted like apple and not like distasteful vinegar.  Consumer demand exploded and Goli committed to purchase as many gummies as Better Nutritionals could manufacture.  Goli was selling direct to consumers through its website ("D2C") as well as selling wholesale to retail stores ("B2B").  Goli also expanded its product line to include additional gummy products, all of which were developed by Better

Nutritionals using its expertise in creating formulations and manufacturing processes (using Vitamin Friends base formulations and processes).

54.   For the first three years, the relationship was smooth and extremely profitable for Better Nutritionals.  Goli obtained national exposure through a highly publicized appearance on "Ellen", first in September 2019, and additionally thereafter, and through partnerships and collaboration with celebrities and "influencers" such as Miley Cyrus, Tony Hawk, Alex Rodriguez and Jennifer Lopez.  Goli continued to provide sales forecasts and assured Better Nutritionals it could rely on those forecasts in planning its ingredient purchases, production staffing and manufacturing schedule. Better Nutritionals immediately commenced and quickly completed production based on those forecasts. In addition, Goli also provided specific and substantial blanket purchase orders.

55.    Better Nutritionals' maximum production output at the Gardena facility was approximately 400,000 bottles a month.  But Goli was projecting a far greater need for ***millions of bottles a month***, and, accordingly, demanded  that Better Nutritionals  increase its production capacity significantly.  Accordingly, during 2019 Better Nutritionals invested heavily to meet Goli's demand and bring the capacity of Gardena up to 1,200,000 bottles per month.  That marked increase, however, was not enough to meet the product quantities Goli demanded and stated that it required.  Goli informed Better Nutritionals it was projecting 12-15 million bottles per month and demanded that Better Nutritionals meet that quota.

56.   Goli's sales forecasts exploded.  In May of 2019, Goli projected a June order of 600,000 bottles per month with a steady monthly rise to approximately 2 million bottles per month by December of 2019.  In August of 2019, Goli submitted a purchase order for a remarkable 50 million bottles for delivery "On-Going Up To Dec 31, 2020," which equates to an average of 2.9 million bottles per month.  To produce this quantity, Goli demanded that Better Nutritionals expand its existing manufacturing capacity five-fold, as it had reached the limits of its manufacturing

capacity at its small Gardena facility, over 80% of which was already dedicated to Goli's needs.  Goli tasked  Better Nutritionals with finding a way to expand its capacity, and to do so as soon as possible.  As it began evaluating opportunities to scale-up, Better Nutritionals continued to rely on Goli's history of timely payment for orders placed to date, representations (often made directly by Agarwal) of sustained high demand in the future, and Agarwal's promises to pay for every bottle of gummies that Better Nutritionals could produce.

57.    Through a series of complex contracts with Better Nutritionals and third parties in early 2020, Goli, on information and belief, aided and abetted, and in agreement with the VMG Defendents, engineered a multi-pronged plan to ensure that Better Nutritionals would become almost entirely dependent upon Goli. In the negotiation of these contracts, both Goli and Better Nutritionals were represented by Defendant DLA Piper despite the obvious conflicts of interest presented by the dual representation. DLA Piper also represented Sharon Hoffman personally.  In breach of its fiduciary duties to Better Nutritionals and Sharon Hoffman, Defendant DLA Piper prepared agreements that dramatically favored the interests of Goli and disregarded the interests of Better Nutritionals and Sharon Hoffman. A close relative of Defendant Agarwal, Safraz Ishmael, the DLA Piper Partner in charge of that firm's ***engagement by Better Nutritionals,*** was working behind the scenes to advance only the interests of Goli.

58.    The first step in Goli's scheme was to convince Sharon Hoffman  to cause Better Nutritionals, to open a new approximately 420,000 square foot facility in Norco, California.  The Norco facility required a multi-million-dollar lease deposit to the landlord, tens of millions of dollars of capital improvements and nearly $70 million in equipment, IT services and tenant improvements to make it compliant with state and federal requirements as a Dietary Supplement manufacturing facility. An expansion that large entailed substantial financial risk.  Goli, however, devised a plan whereby Better Nutritionals would bear the entire financial risk of the hundreds of millions of

1  dollars of investment in and operation of the Norco facility that Goli represented it
2  needed to meet market demand for its gummy products.

3      59.    In the lease for a new facility in Norco, California (the "Norco Lease"),
4  although Better Nutritionals wanted and expected to be the tenant, Defendant Agarwal
5  said that Goli should be identified as the "tenant" and Better Nutritionals identified as
6  the "guarantor." Similarly, with respect to its contract for manufacturing-related IT
7  services and equipment in that facility, Goli introduced Better Nutritionals to Atos IT
8  Solutions and Services, Inc. ("Atos"), to supply IT services and related equipment. It
9  normally would be expected that Better Nutritionals would be the customer and Goli
10 would be the guarantor. But Goli was identified as Atos' "customer" and Better
11 Nutritionals was again identified as a "guarantor." As a result of the agreements,
12 Better Nutritionals would be the sole occupant of the new facility and would be the
13 sole user of the IT services and equipment, while, Goli obtained title to the equipment,
14 and control over Better Nutritionals occupancy, even though Better Nutritionals made
15 all payments for rent, paid the security deposit of $3.0 million and paid tens of
16 millions for the Atos equipment and IT services.

17     60.    Defendant Agrawal promised that the lease and title to the equipment
18 would be transferred to Better Nutritionals on demand, but nothing in the governing
19 contracts protected Better Nutritionals' right to ensure those transfers would take place
20 and that Better Nutritionals would obtain title to the equipment or its leasehold rights
21 as the primary tenant. When Better Nutritionals requested transfer of the tenancy and
22 the title to the equipment, Defendant Agrawal reneged on his prior promises and
23 refused to make any transfer. Prior to that time, Better Nutritionals was a relatively
24 small business that could serve its pre-Goli customers in its 18,000 square foot
25 Gardena facility, for which its monthly rent was $10,000. The facility at Norco was
26 approximately 420,000 square feet, with a monthly rent of $350,000 – 35 times what
27 Better Nutritionals had paid at Gardena.

28

61.    The next step in Goli's scheme, also in 2020, was Goli's meticulous engineering of a fraudulent stock swap transaction where 6913 obtained a 25% interest in Better Nutritionals (which 6913 promptly assigned to Goli) in exchange for a 3% interest in Goli.

62.    The "stock swap" was a fraudulent sale of stock by Goli. The "swapped" interests were fraudulently claimed to be equal in value, but the Goli Defendants knew that at that time the 25% interest in Better Nutritionals Goli received was substantially more valuable than 3% interest in Goli given to Sharon Hoffman.

63.    Worse yet, the agreements for Goli's purchase of the 25% interest in Better Nutritionals contained no restrictions on Goli, either with respect to the affirmation of its past promises upon which Better Nutritionals relied, or its promises to re-assign the Norco lease on demand ,or, for that matter, any requirement that Goli meet certain purchase requirements (typically in the form of a "take or pay" commitment), or any limitation whatsoever on its ability to shift production away from Better Nutritionals. However, the Stock Swap agreements contained extraordinarily onerous restrictions on Better Nutritionals and Sharon Hoffman, including in particular, overly broad restrictions on the ability of Better Nutritionals to manufacture for customers other than Goli who wanted to purchase gummy products from Better Nutritionals., and restrictions on the ability of Sharon Hoffman to sell his 75% equity to a willing buyer.

64.    As a result of its minority interest in Better Nutritionals, its broad contractual restrictions on both Better Nutritionals and Sharon Hoffman in the Better Nutritionals Operating Agreement and the Goli Shareholders' Agreement, including the right under Section 11.1 of the Goli Shareholders' Agreement for the Founders (Agarwal and Bitensky) to act as Sharon Hoffman's mandatary (a person who is authorized to transact business for another), agent and representative, in connection with his role as a shareholder of Goli, the Goli Defendants owed a fiduciary duty to both Better Nutritionals and to Sharon Hoffman.

65.    Defendant DLA Piper represented Sharon Hoffman and Better Nutritionals, in the negotiation and drafting of the Better Nutritionals Operating Agreement [and the Goli Shareholders' Agreement,], despite the obvious conflicts of interest from DLA Piper's past and ongoing representation of Goli, and its principals Agarwal and Bitensky.  In fact DLA Piper acted *only* in the interests of Goli and its principals, and abandoned any duty as counsel to its other clients, Sharon and Odelya Hoffman and Better Nutritionals. Indeed, Safraz Ishmael, a close relative of Defendant Agarwal, was DLA Piper's Partner ***in charge of DLA Piper's engagement by Better Nutritionals.***

66.    With the elements of its scheme to control Better Nutritionals now in place, in  the fall of 2020, Goli engaged Centerview Partners in 2020 to explore a sale of Goli.

**C.**    **Better Nutritionals Scales Up to Keep Up With Goli's Sales Forecasts.**

67.    Goli, Agarwal, and Bitensky knew the effort, expense and risk that Better Nutritionals faced to meet Goli's increasingly large production demands, and the concomitant operation of the Norco facility which came on line in September 2020. In 2021 alone, Better Nutritionals hired ***600*** employees to staff the Norco facility and keep up with Goli's sales forecasts. Even with this increase in the number of Better Nutritionals employees, the  staff still routinely worked overtime.

68.    Better Nutritionals also spent heavily on the supplies and services necessary to manufacture Goli products.  Of course, each dollar represented further exposure to third parties, because Better Nutritionals was responsible for funding these materials and services. In 2021, when Goli accounted for 93% of Better Nutritionals' revenue, Better Nutritionals paid over $200,000,000 to over 500 vendors to obtain, among other things, the raw ingredients, packaging materials, and the technical and logistical support for Goli products.

69.     Better Nutritionals' supply orders eventually became so large that some suppliers asked Better Nutritionals to substantiate the need for its orders by providing a matching purchase order from Goli.  At Better Nutritionals' request, Goli supplied a purchase order, which Better Nutritionals provided to its suppliers.  Goli continued to submit sales forecasts that Better Nutritionals would immediately act upon by reserving production capacity, ordering ingredients, and beginning production.  Goli insisted that Better Nutritionals maintain enough raw materials for 3 months' manufacturing need (based on Goli's projections) due to the supply chain challenges in 2021 following the Covid pandemic.

70.     In order to meet Goli's projections and representations, Better Nutritionals' projected production capacity for Goli products would continue on a straight-line increase throughout 2021.  Better Nutritionals' "Total Practical Capacity" of 4,759,772 bottles per month in April of 2021 was set to increase to 6,310,194 bottles in May, 7,180,538 in June, 8,225,017 in July, 9,49,718 in August, and to a staggering 12,762,753 by December.   Based on Goli's projections and promises, Better Nutritionals sought to reach a peak manufacturing capacity of *28 million* bottles per month by the third quarter of 2022.

71.     On July 16, 2021 Goli submitted a purchase order for *75 million* bottles , for which Goli committed to pay Better Nutritionals $281,000,000.  At the time that this purchase order was submitted, Goli, its Board of Directors and the VMG entities were aware that Goli could not use and would never pay for all of the product ordered.  That purchase order was inflated and fraudulent.  Ultimately, Goli refused to take delivery or pay for $160 million of that purchase order.

72.     In addition,  in July, Goli gave a verbal purchase order for another *300 million* bottles, for which Goli committed to pay Better Nutritionals $1,125,000,000 over a three-year period. Agarwal and Goli's Controller communicated the 300 million bottle order directly to Better Nutritionals' COO, as well as to the owner of the bottle manufacturer, Comar.  Goli, its Board of Directors and the VMG entities were aware

of that order and they were also aware that Goli would never need anything close to that number of bottles in the periods specified. At that time, Defendant Agarwal stated that the deal with VMG had been reached with respect to an investment in Goli by VMG and its affiliates and that the parties were in the process of finalizing documents. On information and belief, VMG had received copies of those Purchase Orders and projections as part of its "due diligence" conducted in its proposed investment in Goli, and, on information and belief knew those projections were false and fraudulent. On information and belief, VMG never complained to or questioned Goli about the fact that Goli's projections were unreasonable, and agreed with Goli that the false projections would put pressure on Better Nutritionals to ultimately sell its business to a firm aligned with Goli.

**D. Goli Suddenly Radically Downsizes Its Orders and Refuses to Take Delivery or Pay for Product It had Ordered.**

73. In July, Defendant Agarwal complained about a "shortfall" in Better Nutritionals production of two to three million bottles of gummies. However, the "shortfall" was not needed by Goli which, unknown to Better Nutritionals, had been increasing its inventory because of diminished sales. The fraudulent purpose behind the "shortfall" claim was to make the inflated forecasts and bogus July purchase orders appear to be genuine, when they were not.

74. A few weeks later, Goli requested a meeting with Better Nutritionals, which occurred on August 10, 2021. Agarwal, Bitensky, Hoffman, and Better Nutritionals' CFO and COO attended. During the meeting, Goli announced that it would cut its sales forecast by a staggering **56%**, from Nine million to four million bottles in August, and from 12 million bottles to 6.4 million bottles in December. For 2022 the numbers dropped from 15 million bottles per month to 6-7 million bottles per month. Goli provided a revised forecast reflecting this cut. Hoffman wrote to Agarwal that the news was "shocking."

75.    Goli also made clear that ***it would not honor*** the full July purchase order and announced  that it held a surplus in its warehouses of ***12 to 14 million bottles***.  In May, June and July Better Nutritionals only produced a total of 12,910,285 bottles. ***Well before July 2021, Goli, and on information and belief VMG,  clearly were aware that the projections*** being submitted to Better Nutritionals and on which Better Nutritionals was reasonably relying, ***were knowingly false and a fraud on Better Nutritionals***.

76.     Goli knew before May 2021 that ***it was unable to sell any*** of the additional bottles that Better Nutritionals was producing in May, June and July.  In reliance on Goli's fraudulent statements, Better Nutritionals incurred substantial costs that would have been avoided had Goli not made its knowingly false projections and submitted knowingly fraudulent  purchase orders that it never intended to honor.

77.    Agarwal fraudulently stated in August 2021 that merely a few months earlier, in June of 2021, he had just learned that consumer demand had dropped, which he attributed to a hodge-podge of unverified issues with Facebook's advertising algorithm.  On information and belief, Goli was well aware of a drop in consumer demand long before that.  Goli's own emails and purchase orders confirm its deception.  For months, Agarwal told Better Nutritionals that Goli faced substantial customer backorders.  Those representations were knowingly false when made.  Better Nutritionals reasonably relied on those representations and incurred significant costs for the purchase of ingredients as well as related labor and other manufacturing costs. Indeed, a significant part of Goli's business in 2021 was selling to retailers.  Retailer purchase orders are often placed 3 to 4 months in advance.  A drop in demand from B2B customers would have been apparent to Goli long before June 2021.

78.    After the August 2021 meeting, Hoffman promptly wrote to Goli to advise it that based on Goli's new information Better Nutritionals had substantial excess capacity which it sought to use to manufacture products for other customers. Better Nutritionals agreed to make Goli its first priority for production of product if

– 23 –
COMPLAINT

Goli was impacted by producing for other customers. Nonetheless, Goli continued to insist that Better Nutritionals keep a 40% "buffer" capacity over the amount being forecast by Goli. Goli also insisted that "Better Nutritionals will not onboard Goli competitors or use the Goli mold/bottle." Because of the onerous definition of "Goli competitors," that restriction severely limited the customers Better Nutritionals could work for. In light of Goli's July oral purchase order for 300 million bottles, the continued insistence on the limitation on the use of the Goli mold/bottle exposed Better Nutritionals to substantial penalty payments that Better Nutritionals was not able to mitigate by using those bottles for other customers.

79.    By the summer of 2021, VMG had still not finalized the paperwork for its investment in Goli. While Goli waited for the VMG deal to close, Agarwal repeatedly urged Better Nutritionals to "stay the course" and maintain production capacity for Goli. In fact, Goli claimed that its orders would rise by the end of the year and soon return to at least 6 million bottles per month, then eventually reach 12 to 15 million bottles per month. On information and belief, VMG, whose representatives also served on the Goli board of directors, was aware of those representations and both Goli and VMG knew that those representations were false.

80.    Better Nutritionals relied on those false representations in the continued conduct of its business. It later became clear that Goli's continued misrepresentations and unwillingness to help Better Nutritionals reduce the losses caused by Goli's breach of its commitments to purchase products it had ordered were part of a plan to inflict unsustainable losses on Better Nutritionals and thereby to force it into a sale of the company that would be to Goli's benefit.

81.    Goli, in precipitously slashing its projections, left Better Nutritionals in a desperate financial position. It had induced Better Nutritionals to expose itself to well over $100 million of liabilities in the construction and operation of the Norco facility in reliance on Goli's ever-larger sales forecasts and purchase orders. Goli had induced Sharon Hoffman to cause Better Nutritionals to commit over 90% of its production

1    capacity to Goli, had forced it to terminate relationships with existing customers and
2    severely limited Better Nutritionals' ability to service other potential customers while
3    Goli defaulted on its financial commitments.

4       82.    By fraudulently inducing Sharon Hoffman to cause Better Nutritionals to
5    allocate nearly all of its production capacity to Goli, by fraudulently misrepresenting
6    and by breaching its agreement to purchase all that Better Nutritionals could produce,
7    as well as specific purchase orders Goli had issued, Goli exposed Better Nutritionals
8    to enormous liability from a host of third parties, jeopardizing the future of the
9    company. and the reputation of the founders  in a close-knit industry.  As we show
10   further below, however, Goli had not completed its plan  designed to sabotage its
11   former "partner" through controlling Better Nutritionals' economic position and  its
12   overall business, and capture for itself all the profits Better Nutritionals would
13   otherwise earn had Goli fulfilled its promises.

14      83.    In October 2021, VMG Partners closed on a $100 million investment in
15   Goli, and secured two of seven board seats along with significant, contractually
16   specified control over Goli.  Promptly thereafter, Goli embarked on a new phase of its
17   scheme: to steal Better Nutritionals trade secrets and the underlying Vitamin Friends
18   proprietary formulas and transfer them to another competing manufacturer, Defendant
19   Merical. Once the Goli Defendants and the VMG Defendants had assured themselves
20   that Merical was capable, with the use of Better Nutritionals and Vitamin Friends trade
21   secrets, to produce an acceptable product for Goli and replace Better Nutritionals, in
22   the fall of 2022 Goli started shifting production from Better Nutritionals to Merical.

23      84.    In 2022, the end game for the Goli Defendants and the VMG Defendants
24   became clear.  Goli embarked on a plan that would force Better Nutritionals to sell the
25   company at a drastically under-valued  price to a buyer **committed to expanding the**
26   **business of Goli**.  In that way, Goli could reap the benefits of an effective vertical
27   integration, and shift manufacturing profits from Better Nutritionals to Goli.
28   ///

**E.**    **VMG's Conspiracy with Goli to Force Better Nutritionals to Sell its Business at an Artificially Low Price to A Buyer who would then Shift Better Nutritionals Profits to Goli.**

85.    The VMG deal closed in October of 2021, resulting in a $100 million purchase of a 4.5% equity stake which it purchased from Defendants Agarwal and Bitensky. Prior to that, however, Goli had informed Hoffman in or about August 2021 that the deal had been agreed to and the parties were working out the paperwork.

86.    As a 3% owner of Goli, Sharon Hoffman told Agrawal that he should have been notified and offered the right to participate *pari pasu* in the VMG purchase of equity. Agarwal agreed, but on information and belief Goli never sought to include Sharon Hoffman in the sale of equity. As a Management Representative under the Goli Shareholders Agreement, Agrawal and Bitenski were charged with giving notices to Sharon Hoffman required under the agreement (Section 11.2.2), and that would have required Goli to produce to Sharon all information that Goli had provided to VMG, which on information and belief, would have revealed some or all of Goli's deceit.

87.    To justify Goli's failure to offer Sharon Hoffman participation in the equity sale, Defendant Agarwal represented to Sharon that VMG would be having an Initial Public Offering in a few months, and that at that time Sharon Hoffman's stock in Goli would be worth much more than the current valuation. That representation was knowingly false. On information and belief, VMG was aware that Goli would make that representation and was aware of its falsity. Goli claimed to have a valuation $2.5 billion, at that time. On information and belief, that claim was knowingly false.

88.    Goli and VMG had a different plan in mind. Instead of an IPO in the short term, Defendant Agarwal proposed that he could force Better Nutritionals into a sale to a buyer who was committed to expanding Goli's business. Once that sale occurred, Goli could effectively claim the benefits of vertical integration and shift to Goli the profits Better Nutritionals would earn under the existing arrangement.

89.    In furtherance of that plan, once the VMG deal closed, Goli presented Better Nutritionals with a sales forecast for the first half of 2022 of only **600,000** bottles per month, representing a 94% decline from the 9 million bottles per month Goli had claimed it would need just a few months earlier, and an 80% decline from the 3 million bottles per month in Goli's July 2021 sales forecast.

90.    Shortly thereafter, in November 2021, Yundi Liang, an employee of Better Nutritionals with a degree in food science and significant familiarity with Better Nutritionals confidential suppliers, and trade secret processes, left Better Nutritionals and shortly thereafter went to a competitor producer of gummy products, defendant Merical.  Apparently, unknown to the Hoffmans or Better Nutritionals, VMG and Goli were planning to divert production of Goli products from Better Nutritionals to Merical.

91.    Sometime thereafter, Better Nutritionals received a phone call from one of its vendors, Herbstreith & Fox, asking about an inquiry they received from a gummy manufacturer. The gummy manufacturer was Merical.  Merical asked Herbsteith & Fox about Pectin, one of the main raw materials Better Nutritionals uses in its production of gummy products. Herbstreith & Fox gave them over a dozen different options but Merical insisted on information specifically for one option, which was the exact formulation Better Nutritionals purchased from Herbstreith & Fox. Merical referenced the item number specifically which is not a published number and was only known by Herbstreith & Fox and Better Nutritionals. This particular pectin was formulated specifically for Better Nutritionals due to its unique formulation requirement.

92.    Shortly before that call, a production employee who worked for Merical for approximately 12 years, left Merical and was hired at Better Nutritionals as a production employee (the "Production Employee").  This Production Employee was at Better Nutritionals for 2 weeks, then left. On information and belief, that employee either returned to work for Merical or communicated with Merical information the

employee had learned at Better Nutritionals.  As a production employee, she had access to Better Nutritionals' batch records, cooking sheets, recipes, and confidential information about suppliers, such as Herbstreith & Fox.

93.    At about the same time, Better Nutritionals learned that Goli and Merical had called Better Nutritionals' flavor supplier, Custom Flavors, and sought the exact flavor that Better Nutritionals was using to manufacture the Goli gummies.  Whether from the Merical connected production employee or from another wrongful source, Merical had obtained confidential, non-public information about Better Nutritional's suppliers and manufacturing processes.  Both employees referenced above were bound by Better Nutritionals' restrictive covenant agreements required to be signed by all employees, including but not limited to, the obligation of confidentiality and non-disclosure of Better Nutritionals trade secrets and other proprietary information (including the trade secrets and proprietary information that Better Nutritionals obtained from Vitamin Friends) to any third party, including future employers.

94.    In March of 2022, Sharon and Odelya Hoffman met for dinner with Wayne Wu, one of the directors appointed by VMG to the Goli Board.  The next day, Sharon and Odelya met with Johnathan Marshall, another director appointed by VMG to the Goli Board. In those meetings, Sharon and Odelya explained that Better Nutritionals had been placed in an impossible position by Goli's repeated misrepresentations about its need for product and continued refusal to honor the payments due under its purchase orders.

95.    The Hoffmans informed each of Wu and Marshall that Goli's failure to honor purchase orders was particularly acute with respect to $18 million worth of Goli gummies that already had been manufactured for Goli because those products have a limited shelf life.  The refusal to honor the 300 million bottle verbal purchase order created a further enormous problem because Better Nutritionals has a penalty fee of 2 cents per bottle if Better Nutritionals fails to take delivery of the bottles.

96.    Following that meeting, Goli and Better Nutritionals entered into a new agreement (the "March 2022 Agreement") that eliminated the overly broad and unworkable definition of "competing products" contained in the Stock Swap agreements and instead defined restricted "competing products" as only "(1) apple cider vinegar gummies and (2) ashwagandha gummies." The March 2022 Agreement also provided that "Goli has requested that Better Nutritionals develop and manufacture for Goli four new products and Better Nutritionals agrees that it will not manufacture for itself or another person products with the same formulation as the New Products."

97.    The March 2022 Agreement provided strong assurances that forecasts would in the future be binding and honored. Section 4 of the Agreement provided: "Effective April 1st, all forecasts are due on the 1st day of each month and will become binding for the 2 following months…All products must be picked up by Goli within the month of forecast." Section 5 of the Agreement provided that all purchase orders for non-competing products would be paid for within 15 days of delivery. Section 6 a. of the Agreement provided: "Except as modified in this letter, all terms and conditions in all other agreements (including, for the avoidance of doubt the agreed upon price and Term) remain unchanged." ***Goli failed to live up to any of those terms.***

98.    Instead of any effort to have Goli live up to its obligations, VMG and Goli continued with their secret plan to shift production from Better Nutritionals to Merical. In breach of its obligations of confidentiality, and its fiduciary duties to Better Nutritionals with respect to the protection of that confidential information of Better Nutritionals, with the knowledge and agreement of VMG and the Goli Board, Goli sought to enable Merical to unlawfully obtain and use Better Nutritionals' and Vitamin Friends' trade secret information in competition with Better Nutritionals.

99.    In July of 2022, Agarwal and Bitensky visited Better Nutritionals' Norco facility and informed Hoffman and Better Nutritionals' CFO and COO that the terms of Goli's deal with VMG required Goli to work with other gummy manufacturers to

produce Goli-branded product.  Even if that were true, the agreement between Goli and VMG could not abrogate Goli's commitment that Better Nutritionals would be Goli's exclusive distributor.  The deal with VMG had been finalized the prior October. Apparently Goli and VMG waited to ensure that Merical  could obtain and use Better Nutritionals and Vitamin Friends' trade secrets before announcing this previously undisclosed and significant contract term supposedly agreed to nearly a year earlier . Neither Wu nor Marshall even hinted at this intention to divert production from Better Nutritionals during the meetings with the Hoffmans in March, nor was this plan disclosed during the negotiations of the March 22 Agreement.

100.  Goli did not plan to acquire gummy products from Merical until October. It then projected that it would buy 250,000 bottles of gummies from Merical in October 2021, and 500,000 bottles of gummies from Merical  in November 2021. Plaintiffs are unaware of the amount of purchases made in 2022 and 2023 but even at a steady rate of the 500,000 bottles ordered for November 2021 , that would amount to 6 million bottles annually, and the total paid to Merical, rather than to Better Nutritionals, would be over $25 million as of the date of the filing of the petition for protection under Chapter 11 of the Bankruptcy Code.

**F. Goli's Pattern of Deceitful Conduct With Other Manufacturers.**

Goli's tortious unlawful and wrongful conduct was not an isolated event in Goli's history of criminal conduct.  Instead, it was part of a pattern of similar wrongful, unlawful and tortious conduct committed several times with respect to manufacturers and suppliers of product for Goli.

*A. Goli's Wrongful Conduct and the Suit by Eclaire Health*

101.  Goli's wrongful acts against Better Nutritionals followed a pattern of tortious and deceitful conduct it engaged in with other suppliers.  One such supplier was Eclaire Health, LLC, formerly known as Eclaire Farm, LLC ("Eclaire").  Eclaire is a manufacturer of chocolate coated confectionary nutritional supplements.  In February 2021, Hoffman introduced Agarwal to Martin Rifkin, CEO of Eclaire, to

1   explore the opportunity for Goli to expand its product line to include chocolate coated

2   confectionary nutritional supplements and have Eclaire develop and supply that

3   product.

4       102.   Agarwal liked Hoffman's idea. Goli urged Hoffman to share with Rifkin

5   Hoffman's experience with Goli's reliable adherence to its forecasts and purchase

6   orders and the extreme growth Goli had experienced and from which   Better

7   Nutritionals had benefited.  Rifkin was impressed.  Accordingly, on May 4, 2021, Goli

8   entered into an exclusive Supply Agreement under which Goli agreed to purchase and

9   Eclaire agreed to manufacture and sell "Goli Bites," which are Goli-branded chocolate

10  flavored chewable vitamins and supplements.

11      103.   At that time, Eclaire was selling chocolate coated confectionary

12  nutritional supplements to retail stores such as Walgreens under the brand name "My

13  Bites."  Argawal told Rifkin that since Goli would purchase all of the chocolate coated

14  confectionary nutritional supplements that Eclaire could produce, Eclaire should

15  transfer the My Bites brand to Goli and cease selling My Bites branded products. The

16  Supply Agreement provided that Purchaser will purchase at least twelve million

17  (12,000,000) bottles of the Finished Products annually and at least three million

18  (3,000,000) bottles of the Finished Products in each calendar quarter.

19      104.   Like Better Nutritionals, Eclaire relied on Goli's forecasts and purchase

20  orders for Finished Products in purchasing raw materials and packaging for, and in

21  producing, Finished Products.  However, in April 2022, Goli abruptly changed course,

22  failed to pay for Finished Products that had been delivered to it, declining to accept

23  delivery of additional Finished Products that it had ordered, and refusing to place any

24  additional orders.  Eclaire has sued Goli.  Eclaire's arbitration against Goli before

25  JAMS, JAMS Ref No. 5425000427,  is currently pending in New York.

26      B. *Goli's Wrongful Conduct and the Suit by Bhagwati Devi Baldwa*

27      105.   The pattern of deceit and refusal by Goli to take or pay for goods

28  produced occurred with Bhagwati Devi Baldwa ("Baldwa"), who developed and

manufactured products under the name of Shri Kartikeya Pharma ("SKP"), sells a branded, full spectrum root only extract called KSM-66 Ashwagandha ("KSM-66"). Ashwanganda has been used for thousands of years as herbal medicine Ayurveda, an Indian natural system of medicine. However, use of Ashwaganda in the United States only started to take off around 2019.  Goli wanted Better Nutritionals to manufacture an Ashwangda gummy for it to sell.  In September 2020, Better Nutritionals had successfully developed an Ashwangda gummy for Goli to sell. The challenge again was to develop a gummy that had an acceptable taste and smell.  Notably, Ashwaganda means "horse smell" or "horse sweat" in Sanskrit.

106.   As it had with Better Nutritionals, Goli told SKP that it would buy all the KSM-66 it could produce.  As it had with Better Nutritionals, Goli provided SKP with massive forecasts.  As it had with Better Nutritionals, Goli persuaded SKP to build a new facility to keep up with Goli's projected demand.  But in August 2021, when Goli refused to take or pay for the Ashwanganda gummies Better Nutritionals had produced for it, Better Nutritionals was left owing SKP millions of dollars that Better Nutritionals could not pay.  Baldwa filed suit against Goli and Better Nutritionals in California Superior Court in December 2022.   As of this writing, Goli has not answered that Complaint.

## J.    The Fallout and Substantial Harm that Goli, Agarwal, and Bitensky Caused to Better Nutritionals and the Hoffmans Personally.

107.   The consequences of Goli's precipitous drop in production demand were swift, severe, predictable, and — according to the plan Goli engineered — borne disproportionately by Better Nutritionals and the Plaintiffs.  With monthly revenue plummeting, Better Nutritionals now faced payment obligations for the Norco Lease, for IT services and equipment, and to third-party suppliers of ingredients, materials, staff, and packaging necessary to produce Goli's product, in addition to payroll and capital improvement costs.  Better Nutritionals had been a significant driver of the local economy, but now had to lay off its trained and valued employees.  Better

Nutritionals had incurred these obligations and hired these employees for the sole purpose of keeping up with Goli's false sales forecasts and purchase orders. To make matters worse, Better Nutritionals had to contend with a looming financial disaster without the lucrative business opportunities that it had terminated or turned down at Goli's behest (such as Nestle, Garden of Life, Nature's Bounty, and Sports Research).

108.   In September of 2021, Better Nutritionals had been valued at $1.35 billion.  Prior to Better Nutritionals' filing for reorganization under Chapter 11 of the Bankruptcy Code,  Goli was seeking to force Better Nutritionals to accept  an offer from a third-party buyer that valued Better Nutritionals at under $90 million, with most of the proceeds going to creditors and $32 million to Goli.  The Hoffmans were promised an undefined and effectively unenforceable "earn out" for some additional funds.

109.   The scheme by Goli and VMG did not work.  Instead Better Nutritionals determined that the interests of the Company would be best served by seeking to recover the hundreds of millions of dollars it lost because of the fraudulent, illegal and tortious acts of the Defendants.

110.   Prior to the filing of the Petition for reorganization, Better Nutritionals sued Goli for $180 million for orders that it placed throughout 2022, including charges for finished goods  that Goli refused to accept, and for tens of millions of dollars  for raw materials, packaging, penalties, and storage costs, as well as for the labor necessary to produce the massive monthly quantities in Goli's sales forecasts and purchase orders. Better Nutritionals also sued the Goli Defendants for various other causes of action seeking damages, including statutory trebling, of up to $900,000,000. Better Nutritionals  also sued DLA Piper for malpractice and breaches of fiduciary duty.  Those claims now belong to the Trustee, who has dismissed them without prejudice and is considering the claims he wishes to pursue.

111.   Plaintiffs believe that those claims are strong and if properly pursued by the Trustee should lead to a recovery sufficient to pay off all creditor claims and

administrative claims in full, and the restoration of significant value to the equity of Sharon Hoffman, now held by Plaintiff RGL Holdings. In all events, Plaintiffs have direct injury resulting from the causes of action as set forth below.  In all events, the restrictions on the ability of the Hoffmans to sell either the products described as "competing products" or "non-competing products" in the March 2022 Agreement are void and unenforceable due to a failure of consideration.

## FIRST CAUSE OF ACTION

### (Defend Trade Secrets Act By Plaintiff Vitamin Friends Against the Goli Defendants, the VMG Defendants, and Merical)

112.    Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

113.    Vitamin Friends was at all times the owner of the trade secret formulations of Vitamin Friends products.  As the contract manufacturer of Vitamin Friends products, Better Nutritionals obtained the Vitamin Friends proprietary formulations, but Vitamin Friends never transferred or abandoned any rights of ownership to its formulations to either Better Nutritionals or to Goli.  Those trade secrets are "trade secrets" within the meaning of 18 U.S.C. §1839 (3).

114.    Based on Goli's fraudulent promises to Better Nutritionals, Vitamin Friends permitted Better Nutritionals to use Vitamin Friends proprietary formulations to make Goli Vitamin Products, including all Goli gummy products marketed for Children.  On information and belief Goli is continuing to violate Vitamin Friends' proprietary rights and have those products manufactured by Defendant Merical and possibly others.

115.    The Goli Defendants, the VMG Defendants and Defendant Merical obtained and misappropriated those trade secrets by improper means within the meaning of 18 U.S.C. §1839 (5) and (6).  Such misappropriation was willful and malicious.

116.   Accordingly, pursuant to 18 U.S.C. § 1836 (b)(3) Vitamin Friends is entitled to an award of damages for actual loss caused by the misappropriation of the trade secrets and damages for any unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, in an amount to be proven at trial, but no less than $20 million, exemplary damages of two times the compensatory loss for additional damages of no less than $40 million, and attorneys' fees.

117.   Vitamin Friends  is also entitled pursuant to 18 U.S.C. § 1836 (b)(2)  to civil seizure of all product manufactured for Goli using Vitamin Friends' trade secrets, and injunctive relief pursuant to 18 U.S.C. § 1836 (b)(3)(A) prohibiting the Goli Defendants, the VMG Defendants and Merical or any other manufacturer supplying products to Goli from continuing to use Vitamin Friends' trade secrets and prohibiting the continued employment by Merical of former employees of Better Nutritionals who had access to Vitamin Friends' trade secrets.

## SECOND CAUSE OF ACTION

**(By the Hoffmans against the Goli Defendants and their Co-Conspirators the VMG Defendants for Fraudulent Misrepresentations )**

118.   Plaintiffs  incorporate each of the preceding paragraphs as if fully set forth herein.

119.   Commencing in or prior to July 2021, the VMG defendants agreed with the Goli Defendants to create a false impression about the current and future financial success of Goli's business that they could use in the future to help sell Goli stock in an Initial Public Offering.  In furtherance of their conspiracy, Goli would submit inflated false and misleading sales forecasts and bogus purchase orders that Goli did not intend to honor. The Goli and the VMG Defendants knew that the sales forecasts were inflated and the purchase orders were bogus.  The Goli and the VMG Defendants knew that Better Nutritionals and Sharon Hoffman were unaware that the forecasts were inflated or that the purchase orders were bogus, and that Sharon Hoffman would cause

1  Better Nutritionals to rely upon the inflated forecasts and bogus purchase orders in
2  purchasing raw materials and in scheduling and proceeding with manufacturing the
3  products it ordered.

4      120.   In furtherance of their conspiracy, the Goli Defendants and the VMG
5  defendants agreed to pretend to agree to the March 2022 Agreement which explicitly
6  provided for binding forecasts, binding commitments to take delivery of produced
7  product and a binding commitment on the price and payment terms for those products
8  that were identified as "non-competitive" in that agreement.  At the time that Goli
9  executed that Agreement, Goli  knew that Sharon Hoffman and Better Nutritionals
10 were unaware that Goli did not intend to live up to the Agreement's terms, despite
11 Goli's fraudulent commitment to do so.

12     121.   The purpose and effect of the March 2022 Agreement was to have Better
13 Nutritionals rely on the March 2022 Agreement in purchasing raw product and in
14 manufacturing product with the expectation of delivery and payment as agreed in the
15 March 2022 Agreement.   Sharon Hoffman caused Better Nutritional and Better
16 Nutritionals  performed in reliance on the March 2022 Agreement.  Goli failed to honor
17 the "binding" forecasts, failed to take delivery as promised, failed to honor the agreed
18 upon purchase price and failed to honor the payment terms for either the competitive
19 or the non-competitive products.

20     122.   On information and belief, the purpose and effect of the inflated sales
21 forecasts, bogus purchase orders and the March 2022 Agreement were to tie up Sharon
22 Hoffman and Better Nutritionals production capacity, thereby limiting their ability to
23 manufacture gummy products for other customers, and to have purchases by Better
24 Nutritionals take ingredients off the market that could be used by competitors of Goli.
25 Another purpose, and intended effect, was to weaken Better Nutritionals' financially
26 in furtherance of the scheme of forcing Sharon Hoffman and Better Nutritionals to sell
27 the Better Nutritionals  business to Goli, or another purchaser who would cooperate in
28 Goli's attempt to obtain for itself the profits Better Nutritionals was earning.

123.  As a result of Sharon Hoffman's ' reasonable reliance on the foregoing intentional fraudulent misrepresentations made by the Goli Defendants, Better Nutritionals was forced into liquidation and the Hoffmans suffered monetary damages. In addition, the Hoffmans suffered loss of business opportunities, loss of their first mover advantage, loss of their equity in Better Nutritionals, loss of money they advanced to Better Nutritionals and loss of income from Better Nutritionals that they personally would have received absent Goli's frauds.  In addition to the quantifiable monetary damages, the Hoffman's hard-earned reputation has been severely damaged, and they have suffered humiliation, anxiety and depression.  These damages continue to increase and will be proven at trial in an amount of  no less than $300 million.

## THIRD CAUSE OF ACTION

### (By the Hoffmans and RGL Holdings against Goli and the VMG Defendants for Breaches of Fiduciary Duties)

124.  Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

125.  As holders of a 25% interest in Better Nutritionals, with substantial contractual control over the conduct of the business of Better Nutritionals, access to the trade secrets and other valuable proprietary intellectual property of Better Nutritionals and Vitamin Friends, Goli owed fiduciary duties to Better Nutritionals and Sharon Hoffman.

126.  By virtue of the fact that two partners in VMG Partners, who are also members of VMG Partners IV's management team   Wayne Wu and Jonathan Marshall, sit on Goli's board of Directors, and the extreme breadth of VMG's control over the conduct of Goli's business under the Goli Shareholders' Agreement, including extraordinary and numerous "consent" rights with respect to  Goli's authority to take certain actions, approval rights of  Goli budgets and business conduct, litigation,  the ability to take action against Agrawal and Bitensky should they creditably be accused of fraud, and most importantly, the right of review and approval of any sale of Goli,

1  VMG owed fiduciary duties to Sharon Hoffman through its control over and ownership
2  in Goli.

3      127.  As a result of the foregoing, Plaintiffs Sharon Hoffman, Vitamin Friends
4  and RGL Holdings were injured by the breaches of fiduciary duties owed to them by
5  Goli and VMG in an amount to be proven at trial, but no less than $300 million.

6  <u>**FOURTH  CAUSE OF ACTION**</u>

7  **(By RGL Holdings, Vitamin Friends and Sharon Hoffman against the**
8  **VMG Defendants for Aiding and Abetting)**

9      128.  Plaintiffs incorporate each of the preceding paragraphs as if fully set forth
10  herein.

11      129.  On information and belief, at all times commencing during VMG's due
12  diligence in the spring of 2021, the VMG Defendants were aware of the Goli
13  Defendants' intentional fraudulent misrepresentations, and Goli's intention to defraud
14  Better Nutritionals and Sharon Hoffman.  On information and belief, VMG as part of
15  its due diligence in connection with the proposed purchase of equity from Goli, VMG
16  received  Goli's fraudulent sales projections and  knew those projections and related
17  information on needed production were inflated and were being provided to Better
18  Nutritionals as accurate.  On information and belief, VMG either caused Goli to
19  prepare or itself prepared more accurate projections of Goli's need for product supplied
20  by Better Nutritionals. On information and belief, during the due diligence period,
21  VMG avoided communicating with Sharon Hoffman or others at Better Nutritionals
22  in an effort to conceal Goli's inflated projections from Sharon Hoffman.

23      130.  With that awareness, the VMG Defendants provided substantial
24  assistance to Goli's efforts to defraud Better Nutritionals and Sharon Hoffman. That
25  substantial assistance included the VMG Defendants' approval of and, through its
26  appointed directors on Goli's Board, participation in Goli's breaches of its contractual
27  obligations to Better Nutritionals, as well as Goli's intentional violations of Better
28  Nutritionals and Vitamin Friends' confidential information and trade secrets.

131.   As a result of the foregoing, the VMG Defendants are jointly and severally liable for the damages incurred by Better Nutritionals, damages that continue to increase and will be proven at trial but no less than $300 million.

## FIFTH CAUSE OF ACTION

### (Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) By the Hoffmans, Vitamin Friends, and RGL Management against Goli, Agarwal, and Bitensky)

132.   Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

133.   The RICO Defendants, Goli, Agarwal, and Bitensky, individually and acting for one another and in concert with each other, have committed the following predicate acts of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). The RICO Defendants have engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(6) by numerous acts of racketeering activity over a several year period.

134.   The intentionally fraudulent misrepresentations alleged above were conveyed either by telephone, or by e-mail, or by other means of electronic communication using the facilities of the internet. Those fraudulent misrepresentations therefore constitute wire fraud in violation of 18 U.S.C.§1343.

135.   The wrongful acts alleged constitute a pattern of racketeering activity which occurred after January 1, 1992 and are within a 10 year period of each other and this action as prescribed by 18 U.S.C. §1961(5).

136.   Throughout the relevant time period, Goli was an "enterprise" within the meaning of 18 U.S.C. § 1961 (4). In addition, the individual RICO Defendants. acted as an association-in-fact and "enterprise" within the meaning of 18 U.S.C. § 1961(4).

137.   The RICO Defendants have conducted and participated in, directly or indirectly, the affairs of the enterprises described above through the pattern of

racketeering activity described above in violation of 18 U.S.C. § 1962(c). All RICO defendants exercised control over the above mentioned enterprises through the acts of each other and in agreement and conspiracy with each other, as part of their fraudulent scheme. The RICO Defendants have conspired to violate 18 U.S.C. §§ 1962(a), and 1962(c) through a pattern of racketeering activities, in violation of 18 U.S.C. § 1962(d).

138. Better Nutritionals, Vitamin Friends, the Hoffmans, RGL Holdings and RGL Management have been injured in their respective businesses and property by reasonable reliance upon the false and fraudulent misrepresentations and omissions to state material facts by the RICO Defendants, including, those set forth and referred to above.

139. Defendants have violated 18 U.S.C. §§ 1962(c) and 1962(d) and as a proximate result of the aforesaid violations, plaintiffs have suffered damages in the amounts of not less than $300 million, plus consequential damages, in an aggregate amount to be proven at trial.

140. By reason of such violations, the RICO Defendants are liable to plaintiff for treble the damages sustained by Plaintiffs, as well as Plaintiffs' costs of suit and reasonable attorneys' fees pursuant to RICO §1962(c).

## SIXTH CAUSE OF ACTION

### (By Sharon Hoffman against Goli, Agarwal, and Bitensky for Securities Fraud)

141. Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

142. In engaging in the actions and course of conduct alleged with respect to the Stock Swap, Goli, Agarwal, and Bitensky each, on more than one occasion, used a manipulative and deceptive device or contrivance in connection with the purchase and or sale of securities; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of

1  the circumstances under which they were made, not misleading; and engaged in

2  acts and manipulative practices which were intended by defendants to operate and did

3  operate as a fraud or deceit upon Plaintiff Sharon Hoffman, all in violation of

4  Section 10(b) of the Securities Exchange Act of 1934, as amended and Rule 10b-

5  5 promulgated thereunder. In particular, the representation that 3% of Goli Inc.

6  stock was equivalent in value to 25% of the ownership of Better Nutritionals was

7  knowingly false and fraudulent. The issuance of promissory notes without any

8  date on which the notes are due was a deceptive device or contrivance.

9      143.   As a direct and proximate result of the violation of Section 10(b) and Rule

10  10b-5, Sharon Hoffman sustained actual and incidental damages. Sharon Hoffman is

11  entitled to void the purchase by Goli of 25% of Better Nutritionals and the restrictions

12  imposed by the Purchase Agreement, Shareholders' Agreement and the Better

13  Nutritionals Operating Agreement.

14                       **SEVENTH CAUSE OF ACTION**

15                    **(Legal Malpractice against DLA Piper)**

16      144.   Plaintiffs incorporate each of the preceding paragraphs as if fully set forth

17  herein.

18      145.   In acting as counsel for both Goli, on the one hand, and in certain cases

19  for Sharon Hoffman and in others both for Better Nutritionals and Sharon Hoffman,

20  on the other hand, and failing to act to obtain and preserve critical rights of Better

21  Nutritionals and Sharon Hoffman, DLA Piper failed to exercise the ordinary

22  reasonable skill and knowledge commonly possessed by a member of the legal

23  profession, and therefore constitutes malpractice. But for DLA Piper's malpractice,

24  Better Nutritionals would not have been in the position a) where Goli could refuse to

25  pay for $180 million of product it had ordered, b) where Goli could dramatically curtail

26  its purchases from Better Nutritionals without substantial advance notice, without

27  default under the agreement, and without penalty, c) where Better Nutritionals and

28  Sharon Hoffman were prohibited from engaging in business with other customers

despite the dramatic curtailment of product purchases by Goli, d) where Sharon Hoffman caused Better Nutritionals to pay all lease expenses at the Norco facility, Better Nutritionals and RGL Management paid for tenant improvement expenses and purchases of equipment, but Goli was able to retain its position as tenant and title to all equipment,  and e) where Goli could shift production away from Better Nutritionals.

146.    As a result of the foregoing, Plaintiff Sharon Hoffman has been damaged as a result of Defendant's malpractice in an amount to be determined at trial, but no less than $200 million.

## EIGHTH CAUSE OF ACTION

### (Breach of Fiduciary Duty against DLA Piper)

147.    Plaintiffs  incorporate each of the preceding paragraphs as if fully set forth herein.

148.    As counsel for Better Nutritionals, and Sharon Hoffman, DLA Piper had fiduciary duties to its clients.

149.    DLA Piper breached its fiduciary duties to Better Nutritionals and Sharon Hoffman when acting as counsel for Goli, on the one hand, and  Better Nutritionals and Sharon Hoffman, on the other hand, by placing the interests of Goli above the interests of Better Nutritionals and Sharon Hoffman and failing to act to obtain and preserve critical rights of Better Nutritionals and Sharon Hoffman. But for DLA Piper's breaches of its fiduciary duties to Better Nutritional and Sharon Hoffman, Better Nutritionals  would not have been in the position a) where Goli could refuse to pay for $158 million of product it had ordered, b) where Goli could dramatically curtail its purchases from Better Nutritionals without substantial advance notice and without penalty, c) where Better Nutritionals and Sharon Hoffman were prohibited from engaging in business with other customers despite the dramatic curtailment of product purchases by Goli, d) where Sharon Hoffman caused  Better Nutritionals to pay all lease expenses at the Norco facility, Better Nutritionals and RGL Management paid for tenant improvement expenses and purchases of equipment, but Goli was able to

1  retain its position as tenant and title to all equipment,  and e) where Goli could shift
2  production away from Better Nutritionals.

3      150.    As a result of the foregoing, Sharon Hoffman has  been damaged as a
4  result of DLA Piper's breach of fiduciary duty  in an amount to be determined at trial,
5  but no less than $200 million.

6                          **NINTH  CAUSE OF ACTION**

7              **(By RGL Management against Goli for Conversion )**

8      151.    Plaintiffs incorporate each of the preceding paragraphs as if fully set forth
9  herein.

10     152.    As previously alleged, Goli is the tenant at the Norco facility, and the
11 "customer" on the purchases of equipment, while Better Nutritionals is only the
12 "guarantor" of those agreements.  Better Nutritionals' Chapter 7 Trustee had arranged
13 for an auction of equipment located in the Norco facility, including, in particular the
14 auction of equipment invoiced to and paid for by RGL Management.

15     153.    Goli has interfered with the Trustee's auctioneer at the Norco premises
16 and on information and belief intends to refuse to allow the auction to go forward in a
17 manner that would maximize RGL's recovery for the equipment it owns at Norco.

18     154.    Accordingly, Goli has converted RGL's equipment and RGL is entitled
19 to damages in an amount to be proven at trial, but no less than $10 million   expended
20 as guarantor for the benefit of the tenant and the title holder to the manufacturing
21 equipment at the Norco facility.

22                              **PRAYER**

23     **WHEREFORE**, Plaintiffs  respectfully request judgment against defendants
24 and each of them as follows:

25     a)      As to the First Cause of Action (i) damages for actual loss caused by the
26 misappropriation of the trade secrets, and (ii) damages for any unjust enrichment
27 caused by the misappropriation of the trade secrets that is not addressed in
28 computing damages for actual loss, collectively in an amount to be proven at trial

1    but no less than $ 50 million together with (iii) exemplary damages of two times

2    the compensatory loss (an additional $100 million) and (iv) attorneys' fees;

3        b)    As to the Second, Third, and Fourth Causes of Action for damages, in an

4    amount to be proven at trial, but no less than $300 million;

5        c)    As to the Fifth Cause of Action for damages for treble the compensatory

6    damages sustained by plaintiff of no less than $300 million, or $900 million in the

7    aggregate, as well  as costs of suit and reasonable attorneys' fees;

8        d)    As to the Sixth Cause of Action for an order voiding Goli's purchase  of

9    a  25%  interest  in  Better  Nutritionals  and  all  restrictions  placed  on  Sharon

10   Hoffman's  ability  to  sell  his  interest  in  Better  Nutritionals  in  those  purchase

11   related agreements;

12       e)    As  to  the  Seventh  and  Eighth  Causes  of  Action,  for  damages  in  an

13   amount to be proven at trial, but no less than $200 million;

14       f)    As to the Ninth Cause of Action for damages in an amount to be proven

15   at trial, but no less than $45  million;

16       g)    As to the Second, Third and Fourth Causes of Action, because the Goli

17   Defendants' and the VMG Defendants' conduct was designed to create oppression

18   of Better Nutritionals, Vitamin Friends and the Hoffmans, and those defendants

19   acted to commit  fraud, and were guilty of malice toward Better Nutritionals,

20   Vitamin Friends and the Hoffmans, in addition to the actual damage sustained by

21   the Hoffmans under California  Civil Code, § 3294, the Hoffmans are entitled to

22   punitive  damages  in  an  amount  sufficient  to  punish  those  Defendants  for  their

23   wrongs and to deter such conduct in the future in an amount to be determined at

24   trial, but no less than $900 million; and

25   ///

26   ///

27   ///

28   ///

1    h)    As to all Causes of Action, for costs, pre-judgment interest and such

2    other and further relief that the Court deems proper.

3

4    **PLAINTIFFS HEREBY DEMAND A JURY TRIAL PURSUANT TO LOCAL**

5    **RULE 38-1.**

6

7    DATED: August 11,  2023                          Respectfully Submitted,

8                                                     Shulman Bastian Friedman
                                                      & Bui LLP
9

10                                          By:_____

11                                                   Leonard M. Shulman
                                                     100 Spectrum Center Dr., Ste. 600
12                                                   Irvine, California 92618
                                                     (949) 340-3400
13                                                   Email:
14                                                   lshulman@shulmanbastian.com
                                                     *Attorneys for Plaintiff*
15
                                                     Folkenflik & McGerity LLP
16                                                   Max Folkenflik
                                                     1500 Broadway, Suite 810
17                                                   New York, New York 10036
                                                     (212) 757-0400
18
                                                     Email: mfolkenflik@fmlaw.net
19                                                   *Attorneys for Plaintiff (seeking
                                                     admission pro hac vice*
20

21

22

23

24

25

26

27

28

COMPLAINT